IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARIA MELENDEZ                    :

                                  :

     v.                           :   Civil Action No. DKC 14-3636

                                  :

BOARD OF EDUCATION FOR
MONTGOMERY COUNTY                 :

## MEMORANDUM OPINION

Presently pending and ready for resolution in this employment case are a motion for summary judgment filed by Defendant Board of Education for Montgomery County ("Defendant") (ECF No. 70), and a motion to strike filed by Plaintiff Maria Melendez ("Plaintiff") (ECF No. 77). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendant's motion for summary judgment will be granted, and Plaintiff's motion to strike will be denied.

## I. Background

### A. Factual Background[1]

From 1997 until her resignation on July 19, 2011, Plaintiff worked at Albert Einstein High School ("AEHS") for Defendant as a morning shift building services worker ("BSW"). (ECF Nos. 70-4, at 5-6; 70-22, at 22). The responsibilities of a BSW include

---

[1] Unless otherwise noted, the facts outlined here are undisputed and construed in the light most favorable to Plaintiff. Additional facts will be provided in the analysis.

"varied building cleaning duties and related facilities and grounds maintenance work . . . [that] requires sustained physical effort[.]" The job "involves some heavy work in moving or lifting furniture," and requires the ability to lift a minimum of fifty pounds. (ECF No. 70-22, at 12; *id.* ¶ 3; *see also* ECF Nos. 70-6 ¶ 3; 70-4, at 8, 21). This job description is the same for all BSWs employed by Defendant, regardless of their gender or their school assignment.

BSWs at AEHS were assigned to either a morning or evening shift. (ECF No. 7, at 3). Within these shifts, the employees were assigned to different, overlapping schedules. When Plaintiff was hired to the AEHS morning shift in 1997, she was assigned to work from 10:30 a.m. to 7:00 p.m. (ECF No. 70-4, at 6). In 2001, her supervisor, building services manager Michael Moreland, agreed to change her hours to 6:30 a.m. to 3:00 p.m. (*Id.* at 7). Over time, Plaintiff may have begun to work from 6:00 a.m. to 2:30 p.m. instead. (ECF No. 76-2, at 54; *see also* ECF Nos. 70-6 ¶ 11; 70-14 ¶ 9; 70-14, at 6. *But see* ECF No. 70-4, at 7 ("Q So at the time that Tony Hopkins became the Acting Building Service Manager [in 2010] you were still supposed to be working from 6:30 to 3:00 p.m.? A Correct.")). In 2010, the morning shift was staffed by six BSWs, three women (Plaintiff, Frances Miller, and Maria Ayala) and three men (Cleon Butler, Nathaniel Contreras, and Patrick Hyland). (ECF No. 70-7, at 3).

2

Ms. Miller and Ms. Ayala were scheduled to begin work at 5:00 a.m., Plaintiff and Mr. Butler began at 6:00 a.m., and Mr. Contreas and Mr. Hyland began work at 8:00 a.m. and 10:30 a.m., respectively. (ECF Nos. 70-22 ¶ 6; 76-2, at 46). Plaintiff, Ms. Miller, Ms. Ayala, Mr. Contreas, and Mr. Hyland were primarily assigned to indoor cleaning tasks, but were regularly required to assist outdoors as needed. (ECF No. 76-2, at 57). Mr. Butler was assigned as the school's "groundskeeper" and "was responsible for maintaining the grounds on the exterior of the school building," although he assisted indoors as needed, which occurred "daily." (*Id.*).

In March 2010, AEHS principal James Fernandez noticed issues with the cleanliness of the cafeteria after lunch, which was then the responsibility of Plaintiff, Ms. Ayala, and Ms. Miller. (ECF No. 70-14 ¶ 4). Mr. Fernandez attempted to locate the BSWs on numerous occasions in the afternoons, but was unable to do so. He inquired into the schedules of the three BSWs, and was told by Tony Hopkins, then the school's plant equipment operator, that the three BSWs had been leaving work before the end of their scheduled shifts. When their supervisor, Mr. Moreland, "was not forthcoming with any type of response about whether he had knowledge that these three employees were not working their full shifts," Mr. Fernandez had AEHS business manager Robin Hart conduct an investigation into the possible

payroll fraud. (*Id.* ¶¶ 5-6). Ms. Hart reviewed security footage from a two-week period that month and compared the departures of the BSWs with their scheduled shifts and timecards. (*Id.* ¶¶ 7-8). Ms. Hart reported that Plaintiff had left the school premises between 10:30 a.m. and 12:10 p.m. every day of that pay period without returning, but had been scheduled to work until 2:30 p.m. and had submitted time sheets reflecting that she worked 8-hour days. (*Id.* at 6). Ms. Hart reported similar findings as to the other two employees. (*Id.*). Plaintiff and her co-workers deny these allegations. (*See* ECF Nos. 75-31 ¶ 14; 70-16 ¶ 3).

At the end of April, Mr. Moreland retired and Mr. Hopkins became the acting building services manager.[2] (ECF Nos. 70-6 ¶¶ 2-3; 70-14 ¶ 10). In early May, Mr. Fernandez and Mr. Hopkins discussed AEHS's building services needs. (ECF Nos. 70-14 ¶ 10; 76-2, at 30). In addition to issues with the cleanliness of the school in the afternoon, Mr. Hopkins identified staffing shortages in the afternoons when deliveries were received. (ECF No. 76-2, at 53). Additionally, because the evening shift BSWs left the school ready to open in the mornings, the first task requiring multiple BSWs was to clean the cafeteria after breakfast at 7:30, and accordingly, Mr.

---

[2] Mr. Hopkins became the acting manager on May 3, and was hired as the building services manager in July 2010. (ECF No. 76-2, at 50).

Hopkins testified, there was not enough work in the early mornings to require three BSWs indoors. (*Id.* at 28, 53; ECF No. 70-22 ¶ 6). Based on this information, Mr. Fernandez "determined that their hours had to be changed so that we would have BSW staff available in the afternoons to meet the needs of the school." (ECF No. 70-14 ¶ 12). Mr. Fernandez decided to change the schedules of Plaintiff and Ms. Ayala, but did not change Ms. Miller's or Mr. Butler's hours because they had other early morning duties. (*Id.* ¶ 11). Ms. Miller, who worked from 5:00 a.m. to 1:30 p.m., was the most senior BSW and had long been responsible for unlocking and opening the school in the morning. (ECF No. 70-22 ¶ 6). Mr. Butler, who began at 6:00 a.m., was responsible for tasks relating to the maintenance of the exterior grounds, for which the evening shift BSWs were not responsible. (*Id.*). Mr. Fernandez affirmed that he also made the change so that he could ensure that Plaintiff and Ms. Ayala were working until the end of their shifts because of the timecard issues identified earlier that year. (ECF No. 70-14 ¶ 10). Because the employee union's contract permitted Mr. Fernandez to change an employee's shift by up to two hours without bargaining for prior approval, Plaintiff's hours were changed from 6:00 a.m. to 2:30 p.m., to 8:00 a.m. to 4:30 p.m., and Ms. Ayala's hours were changed from 5:00 a.m. to 1:30 p.m., to 7:00 a.m. to 3:30 p.m. (*Id.* ¶ 11).

In Plaintiff's declaration, she states that Mr. Hopkins "told [her] that he did not want women working in the morning" (ECF No. 75-31 ¶ 6), and she testified at her deposition that Mr. Hopkins "said I don't want the three women on my schedule" (ECF No. 76-1, at 12).   Mr. Hopkins denies saying this and denies that he did not want women to work for him.  (ECF No. 76-2, at 55).  Plaintiff also testified that Mr. Fernandez told her that it was Mr. Hopkins who changed her schedule (ECF No. 76-1, at 24), but Mr. Fernandez testified that he was the only one with the authority to change Plaintiff's schedule and that he was the one who made the decision (ECF No. 70-14 ¶ 10).  While Mr. Hopkins testified that he was involved in the decision, he also testified that he did not have the authority to change the BSWs' schedules and that Mr. Fernandez was the one who did so. (ECF No. 76-2, at 53, 55).

Mr. Fernandez avers that he held separate meetings with Plaintiff, Ms. Ayala, and Ms. Miller on May 13, 2010, to discuss the results of the payroll investigation, direct them to work their full scheduled hours, and clarify their job duties.  (*Id.* ¶ 11).  In his meetings with Plaintiff and Ms. Ayala, he also explained his decision to change their scheduled hours.  (*Id.*). These changes were confirmed in writing on May 24, 2010, the day they were to go into effect.  (*Id.* ¶ 13; *id.* at 10; *see also* 76-1, at 26).

On May 26, a letter signed by Plaintiff, Ms. Miller, and Ms. Ayala was sent to Defendant's office of human resources and the superintendent's office. (ECF No. 70-14, at 13-15; *id.* ¶ 13). The letter alleged discrimination and harassment by Mr. Hopkins and AEHS's security staff, and requested a meeting with human resources and a union representative. (*Id.* at 13-15). The letter identifies Plaintiff as its author (*see id.* at 13 ("I, Maria Melendez, Building Service Worker")), although she testified that the BSWs wrote it together (ECF No. 76-1, at 26). Ms. Ayala testified during her deposition that, while the signature on the last page was hers, she had not seen the letter before, did not know who wrote it, and was not familiar with its contents. (ECF No. 70-15, at 14-15). She also denied that she was harassed at AEHS, that she felt unsafe working there, and that Mr. Hopkins had told her he did not want women working for him. (*Id.* at 16-19). Ms. Ayala further denied ever making a complaint about Mr. Hopkins. (*Id.* at 20-21). Ms. Miller affirmed that she first learned of the full contents of the letter during the meeting with human resources, upon which she "immediately withdrew" her complaint. (ECF No. 70-16 ¶ 4). Ms. Miller stated in her affidavit she "was misled by Ms. Melendez," that she had understood the letter only to be about the allegations of payroll fraud, which she disputed, and that "it is not true that I was being harassed, oppressed or working

7

under unbearable or stressful working conditions. Nothing in the letter is true." (*Id.* ¶¶ 3-4).

The office of human resources investigated the May 26 letter's allegations. Meetings were held with each of the letter's signatories and representatives from human resources and the union, and a review of the March payroll investigation was also conducted. (*See* ECF No. 70-17). Following a "full and complete investigation," the office of human resources "was unable to substantiate any allegations of discrimination." (ECF No. 70-13 ¶ 5). It determined that Plaintiff and Ms. Ayala's hours were changed by Mr. Fernandez because three BSWs were not needed indoors so early in the morning, that the changes were authorized under the union contract, that the March security tapes clearly showed the employees leaving the building prior to the end of their scheduled shifts in contradiction of their timesheets, and that none of the complaining employees had lost time, benefits, or money as a result of the schedule changes. (*Id.; see also* ECF No. 75-31 ¶ 15). Plaintiff was notified on June 17 that her allegations were not substantiated. (ECF No. 70-17). Plaintiff's union also notified Plaintiff on July 7 that her allegations against Mr. Hopkins were not substantiated, the change in her work hours was consistent with the union

contract, and the union's investigation of her complaint was complete. (ECF No. 70-18).[3]

In February 2011, Plaintiff met with AEHS business manager Simon Seaforth "to discuss various issues with her job performance and professionalism." (ECF No. 70-22 ¶ 9). Mr. Hopkins, Plaintiff's manager, was also present. Mr. Seaforth stated in his affidavit that this meeting was held following "repeated counseling sessions" relating to complaints he had received and "[a]s a result of the continuing and escalating problems that [he] observed" with Plaintiff's performance. (*Id.* ¶¶ 8-9). During the meeting, Mr. Seaforth provided Plaintiff with a draft performance review, identifying areas on which performance issues had been identified, but "made it clear . . . that this was a counseling session as opposed to her employee evaluation." (*Id.* ¶ 9).

Two weeks later, Mr. Seaforth met again with Plaintiff for her formal employee evaluation, which was scheduled for every three years. (*Id.* ¶ 10). Again, Mr. Hopkins was present, but

---

[3] In October 2010, Plaintiff again contacted her union regarding the May schedule change, alleging that the change in her work hours was discriminatory. (*See* ECF No. 70-19). She did not provide a reason for this belief, and instructed the union not to contact Mr. Fernandez to investigate the issue. When the union representative reviewed the union's files and found that this allegation had already been investigated, Plaintiff was informed again that her complaint was not substantiated and was closed. (*Id.*). Plaintiff also declares that she "once again called the union about Tony" in January 2011. (ECF No. 75-31 ¶ 13).

did not conduct the review himself because Mr. Seaforth was training him on how to conduct performance reviews.[4]   (*Id.*). Plaintiff's performance review indicated that she failed to meet three of the seven core competencies for her job. (*Id.; id.* at 19-21).   Plaintiff refused to sign the review.   Because Plaintiff had received a negative performance review, she was automatically referred for intake into the Performance Improvement Process ("PIP").   (ECF No. 70-13 ¶ 8).   PIP "provides underperforming supporting services employees with an opportunity to receive the intensive individualized assistance and professional development necessary to improve job performance and meet the core competency criteria," and offers employees different program options. (*Id.* ¶ 9).   Mr. Seaforth attended Plaintiff's PIP intake meeting with a human resources professional growth consultant, at which she was presented with these options.   (*Id.* ¶ 10; ECF No. 70-22 ¶ 11).   Because Plaintiff refused to choose a plan, she was automatically placed into the default option, a 90-day Special Evaluation. (ECF No. 70-13 ¶ 10).   This option "is specifically designed to assist an

---

[4] A school counselor was also present to assist with interpretation for Plaintiff. (ECF No. 70-22 ¶ 10). The record reflects that interpreters were provided for Plaintiff at various times, including during the investigation of her May 26 complaint (*see* ECF No. 75-7), her performance review (ECF No. 70-22 ¶ 10), and a meeting regarding her resignation (*id.* ¶ 15). Plaintiff does not raise language difficulties in connection with her claims.

underperforming employee toward success in their assigned position." (*Id.* ¶ 11).

On July 19, 2011, Plaintiff resigned without notice. (ECF No. 70-22, at 22). Mr. Seaforth affirms that when she informed him she was quitting, he found it "sudden and unexpected." (*Id.* ¶ 15). He asked another employee to translate while informing Plaintiff that she was not being forced to resign and explaining that she would lose seniority rights if she wanted to be re-employed by Defendant at a later time after resigning. He avers that he provided Plaintiff with a Notice of Termination of Employment form and advised "that she not make a hasty decision" and "to sleep on it." (*Id.*). Later that afternoon, Mr. Seaforth found the completed form under his office door, signed by Plaintiff and indicating that the "Reason for Resignation" was "Home Responsibilities," and he affirms that the copy attached and incorporated to his affidavit is an exact copy of the form he found. (*Id.; id.* at 22). While Plaintiff does not dispute that she resigned on July 19 and confirmed her signature on this form, she testified that she did not check the "Home Responsibilities" box on the form and that she had written a note on the form stating "they're forcing me to leave because they've tried to get rid of me." (ECF No. 76-1, at 40).

**B.    Procedural Background**

In    January    2012,    Plaintiff    filed    a    charge    of
discrimination, harassment, and hostile work environment with
the Equal Employment Opportunity Commission ("EEOC").  (*See* ECF
Nos. 31-3; 31-4).  On April 6, 2012, Plaintiff's case was closed
after Plaintiff purportedly withdrew her complaint, as further
discussed in the court's order granting in part and denying in
part Defendant's motion to dismiss or for summary judgment (ECF
No. 45).   On March 15, 2013, however, the EEOC reopened the
investigation, and a notice of right to sue letter was issued to
Plaintiff on May 20, 2014.  (ECF Nos. 31-6; 31-7).

Plaintiff filed a *pro se* complaint in the Circuit Court for
Montgomery County, Maryland on August 19, 2014, naming AEHS as
defendant.    (ECF  No.  2).    Plaintiff  subsequently  retained
counsel and filed an amended complaint adding Montgomery County
Public Schools as a defendant.   (ECF No. 11).   After the
defendants removed the case to this court and moved to dismiss,
Plaintiff filed a second amended complaint substituting the
Board of Education for Montgomery County as a defendant.  (ECF
No. 30).  The second amended complaint asserts five claims under
Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e,
*et seq.* ("Title VII"): sex discrimination (Count I); retaliation
(Count II); disparate treatment (Count III); hostile work
environment (Count IV); and adverse employment action (Count V).

(ECF No. 30 ¶¶ 132-61).  The complaint also included eight state law claims (Counts VI through XIII).  (*Id.* ¶¶ 162-90).  Defendant moved to dismiss or for summary judgment on all claims.  (ECF No. 31).  The motion was construed as a motion for summary judgment and granted as to the state law claims because the claims were time-barred.  (ECF No. 45, at 22-29).  Defendant argued for judgment on the Title VII claims on the ground that Plaintiff had failed to exhaust her administrative remedies by withdrawing her EEOC claim and not refiling it within the prescribed limitations period.  (*Id.* at 11-21).  Given the disputed evidence as to whether Plaintiff had withdrawn her EEOC claim, Defendant's motion was denied.  (*Id.* at 21).

Discovery has now been completed, and Defendant has moved for summary judgment.  (ECF No. 70).  Plaintiff filed a response in opposition (ECF No. 74), and Defendant replied (ECF No. 78).  Plaintiff also filed a motion to strike portions of Defendant's exhibits to the motion for summary judgment (ECF Nos. 74; 77), and Defendant responded (ECF Nos. 78; 79).

## II.  Plaintiff's Motion to Strike

In her opposition to Defendant's motion for summary judgment and in a separately filed motion, Plaintiff has moved to strike all or part of four affidavits filed as exhibits to Defendant's motion.  (ECF Nos. 74, at 2-8; 77).  Plaintiff's motion to strike must be addressed first because Defendant

relies on the evidence to which Plaintiff objects in connection with the motion for summary judgment.  *See Stanley Martin Cos. v. Universal Forest Prods. Shoffner LLC*, 396 F.Supp.2d 606, 611 (D.Md. 2005).  Pursuant to Fed.R.Civ.P. 56(c):  "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

Plaintiff first objects to the Affidavit of Francis Miller (ECF No. 70-16), who retired in 2011 and is accordingly Defendant's former employee, citing Fed.R.Civ.P. 26, 30, and 37. (ECF No. 74, at 2-6).  This affidavit was executed on January 14, 2016.  Prior to the execution of this affidavit, Defendant had noticed Ms. Miller's deposition for January 20, 2016, and Plaintiff had separately noticed Ms. Miller's deposition for February 8.  (*See* ECF No. 78-1).  On January 8, in response to Plaintiff's counsel's inquiry, Defendant's counsel informed Plaintiff that it had not yet been able to serve Ms. Miller. (*See* ECF No. 75-2).  According to Defendant's counsel, Ms. Miller was subsequently served with Defendant's deposition subpoena on January 13, after more than thirteen attempts were made, and she then contacted Defendant's counsel and agreed to provide an affidavit.  (ECF No. 78, at 15 & nn.6-7).  Defendant then decided not to take Ms. Miller's deposition, released her

from its subpoena, and notified Plaintiff's counsel that Defendant was canceling her deposition. (*Id.*). Plaintiff never served her subpoena on Ms. Miller, and did not request additional time to effect service. (ECF No. 74, at 4).

Plaintiff baselessly argues that Defendant's actions prevented her from deposing Ms. Miller. (*Id.* at 3). Plaintiff contends that Defendant's counsel was required to serve its deposition subpoena on Ms. Miller when its counsel met the witness on January 14, but Defendant's subpoena had already been served at that time, and Defendant was permitted to release the witness from the subpoena. Defendant's counsel was certainly under no obligation to take an unnecessary deposition.[5] Ms. Miller's cooperation with Defendant to provide an affidavit does not, as Plaintiff argues, show that Ms. Miller was within Defendant's custody and control, and there is no evidence that the contact information Defendant provided Plaintiff for Ms. Miller was inaccurate. Finally, assuming *arguendo* the affidavit

---

[5] Plaintiff argues that Defendant violated Fed.R.Civ.P. 30(g), which provides: "A party who, expecting a deposition to be taken, attends in person or by an attorney may recover reasonable expenses for attending, including attorney's fees, if the noticing party failed to: (1) attend and proceed with the deposition; or (2) serve a subpoena on a nonparty deponent, who consequently did not attend." (ECF No. 74, at 4). Plaintiff's counsel was informed in advance of the cancellation of Ms. Miller's deposition, however. As Plaintiff admits, "Plaintiff's counsel showed up for the deposition of *Maria Ayala*," which had also been noticed for January 20 and proceeded as scheduled. (*Id.* (emphasis added)). Counsel did not attend expecting Ms. Miller to be deposed. Accordingly, Plaintiff is not entitled to reasonable expenses pursuant to Rule 30(g).

was discoverable, Plaintiff has not identified any discovery request to which the affidavit would have been responsive. Plaintiff's motion to strike Ms. Miller's affidavit and request for sanctions and fees will accordingly be denied.

Plaintiff next objects to paragraph 7 of the affidavit submitted by Heather Dublinski (ECF No. 70-13), a coordinator and human resources compliance specialist for Defendant, arguing that her statement is not true. (ECF No. 74, at 6). Plaintiff's objection is without merit. Plaintiff may dispute Ms. Dublinski's affidavit with her own evidence, or could have objected pursuant to Fed.R.Civ.P. 56(c), but her unsupported argument that "the MCPS records Dublinski refers to do not exist" (*id.*), is plainly an insufficient ground to strike the affidavit testimony. Plaintiff also moves to strike paragraphs 9 and 10, alleging that Defendant failed to produce the referenced document during discovery (*id.*), but she again fails to identify a discovery request to which the document would have been responsive. Plaintiff's motion to strike portions of Ms. Dublinski's affidavit will therefore be denied.

Plaintiff also objects to the majority of Donald Smith's affidavit (ECF No. 70-20), arguing that it contains information that is not based on his personal knowledge and that his demonstrative exhibit was not produced in discovery. (ECF No. 74, at 6-7). Mr. Smith is a security assistant at AEHS. His

16

affidavit is based on his own experiences working for Defendant, and his demonstrative aid was not responsive to Plaintiff's discovery request.  Plaintiff's motion to strike will be denied.

Finally, Plaintiff moves to strike portions of Simon Seaforth's affidavit.  First, she objects to paragraph 13 on the ground that it holds him out to be an expert (*id.* at 8), but this paragraph is based on his personal experience and does not hold him out to be an expert.  Plaintiff also moves to strike exhibit 19B to Mr. Seaforth's affidavit, a draft performance evaluation he affirms he gave to Plaintiff on February 17, 2011, on the ground that it "is not a true and correct copy of the exhibit exchanged by the parties during discovery," citing generally her statement of disputed facts and exhibits 9 and 20 in support.[6]  (*Id.*).  Plaintiff's exhibit and declaration may be evidence that a dispute of fact exists over the contents of the draft evaluation, but they do not provide proper grounds for objecting to or striking evidence on a motion for summary judgment.  Accordingly, Plaintiff's motion as to Mr. Seaforth's affidavit will also be denied.

---

[6] Plaintiff's exhibit 20 includes the first two pages of Defendant's exhibit 19B, but also includes a signature page and omits Plaintiff's attendance records found in exhibit 19B.  (ECF No. 75-16).  Plaintiff declares that her exhibit is a true and correct copy of the document in her custody that she produced to Defendant.  (ECF No. 75-33 ¶ 2.a).  Exhibit 9 is a 345-page exhibit containing records from the EEOC investigation file, and its relevance here is unclear.  (*See* ECF Nos. 76-4; 76-5).

For the foregoing reasons, Plaintiff's motion to strike will be denied.

## III. Defendant's Motion for Summary Judgment

Plaintiff's second amended complaint contains five Title VII counts: sex discrimination (Count I); retaliation (Count II); disparate treatment (Count III); hostile work environment (Count IV); and adverse employment action (Count V). (ECF No. 31). Defendant has moved for summary judgment on all claims.

### A.   Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

The moving party bears the burden of showing that there is no genuine dispute as to any material fact. If the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof, however, then there is no genuine dispute of material

fact. *Celotex*, 477 U.S. at 322–23. Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an "affidavit or other evidentiary showing" demonstrating that there is a genuine issue for trial. *See Ross v. Early*, 899 F.Supp.2d 415, 420 (D.Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted). In other words, a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted); *see Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir. 1993). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *Scott v. Harris,* 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

**B.   Analysis**

**1.   Count I, Sex Discrimination**

Title VII prohibits discrimination based on an employee's personal characteristics such as "race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2525 (2013).   To survive a motion for summary judgment, a plaintiff asserting a Title VII claim must provide evidence of intentional discrimination through one of two avenues of proof:   (1) direct evidence that discrimination motivated the employer's adverse employment decision, or (2) the *McDonnell Douglas* "pretext framework" that requires a plaintiff to show that the "employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination."   *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284-85 (4th Cir. 2004) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973)).

**a.   Direct Evidence of Intentional Discrimination**

Direct evidence includes "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc)).   If believed, direct evidence "would prove the

existence of a fact . . . without any inference or presumptions." *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 548 (4th Cir. 1995) (alteration in original) (quoting *Bodenheimer v. PPG Indus.*, 5 F.3d 955, 958 (5th Cir. 1993)), *rev'd on other grounds*, 517 U.S. 308 (1996). To overcome a motion for summary judgment using direct evidence, a plaintiff "must produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude and the employment action." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999), *overruled on other grounds by Desert Palace v. Costa*, 539 U.S. 90 (2003).

Plaintiff argues that a single statement allegedly made by Mr. Hopkins, that "he did not want three women working in the morning," is direct evidence of a discriminatory attitude that bears on Mr. Hopkins's decision to change Plaintiff's schedule. (ECF No. 74, at 35). Assuming *arguendo* that this statement was made, it is not evidence of discriminatory attitude.[7] As a

---

[7] Plaintiff contends that it is undisputed that Mr. Hopkins made this statement, citing an answer he gave during his deposition to a "clear and unambiguous" question. (ECF No. 74, at 15 n.14). Plaintiff mischaracterizes both the question and answer. Plaintiff's counsel asked Mr. Hopkins: "Okay, so prior to you stepping out on the break, we talked a little about the shifts differentials, (inaudible 20:21:33), so you stated earlier you didn't want the three women working in the morning, right?" (ECF No. 76-2, at 27). Counsel was referring to an earlier question of whether Plaintiff, Ms. Miller, and Ms. Ayala worked on the morning or evening shift. (*Id.* at 25). That

preliminary matter, "it is not clear that a single, isolated statement could provide the requisite direct evidence of intent." *Mungro v. Giant Food, Inc.*, 187 F.Supp.2d 518, 521 (D.Md. 2002). Even if it could, however, the alleged statement itself does not indicate a discriminatory attitude. According to Plaintiff, Mr. Hopkins did not say that he did not want women working for him, he said that he did not want the *three* female BSWs working *in the morning*. This is entirely consistent with the testimony of Mr. Hopkins, Mr. Seaforth, and Mr. Fernandez, and the findings of the human resources and union investigations, that Plaintiff's schedule was changed only because too many BSWs were scheduled to work too early in the morning.

Moreover, Plaintiff's assertions that Mr. Hopkins "didn't want the women working in the morning, because he believed that the three female building service workers . . . 'could not do the work' simply because they were women" (ECF No. 74, at 36-37), and that Mr. Hopkins "arbitrarily changed the hours to eliminate the female staff in the morning on his own" (*id.* at 16), are clearly contradicted by the record. First, Ms.

---

question, in response to which Mr. Hopkins had confirmed that those BSWs worked the morning shift, had been followed by a break in the deposition and then by twenty-six other questions by counsel. (*Id.* at 25-27). Mr. Hopkins answered "correct" to counsel's question, then immediately changed his answer and reiterated multiple times that he had, understandably, misinterpreted the question. (*Id.* at 27).

Miller's early morning schedule was never changed, and Ms. Ayala and Plaintiff's schedules were adjusted – at most - by only two hours.[8]  It is undisputed that all three female BSWs continued to work on the same shift for Mr. Hopkins in the morning.   Second, Mr. Hopkins repeatedly and consistently testified that, while he believed all of the female BSWs to be capable of performing the tasks of a BSW on the morning shift, there were not enough of those tasks at 5:00 and 6:00 a.m. to necessitate having three BSWs working indoors at that time, regardless of their gender. (See ECF No. 76-2, at 27-28).[9]  The majority of the BSWs's tasks

---

[8]  Plaintiff states that Ms. Miller's hours "were changed from 5:00 am to 7:00 am," citing a June 8, 2010 email by Ann Kamenstein in the office of human resources.  (ECF No. 74, at 16).  Ms. Kamenstein's email summarizes the May 2010 complaint made by Plaintiff, Ms. Ayala, and Ms. Miller, but it does not show that Ms. Miller's schedule was changed.  (See ECF No. 75-7).  It is undisputed that Ms. Miller's schedule was not changed.  (See ECF Nos. 70-14 ¶¶ 10-12; 70-22 ¶ 6).

[9]  Plaintiff repeatedly cites a portion of Mr. Hopkins's deposition in which he stated that he had not required Plaintiff to move heavy, broken cafeteria furniture, as she specifically alleged in her complaint (ECF No. 30 ¶¶ 85-86), because of "their size and their strength and ability" (ECF No. 76-2, at 59).  (See ECF No. 74, at 14, 36-37, 56).  Plaintiff argues that this statement shows Mr. Hopkins believed women incapable of performing the required duties of a BSW, but Mr. Hopkins actually testified that the reason he did not require Plaintiff to move the broken tables in the manner she alleged was because the size of the tables necessitated the use of a hand truck to move.  (ECF No. 76-2, at 59).  Plaintiff now attempts to argue, simultaneously, that Mr. Hopkins moved her off the morning shift because he did not believe she could lift furniture and lifting furniture was necessary during the morning shift; that Mr. Hopkins showed "favoritism" to the male BSWs by only requiring male BSWs, and not female BSWs, to lift furniture; but also that Mr. Hopkins retaliated against her and harassed her by forcing

23

necessarily were done later in the day after school started. (*See* ECF No. 76-2, at 27-28).  Plaintiff and Ms. Ayala were not replaced from 5:00 a.m. to 8:00 a.m. by male BSWs, and there were no male BSWs assigned to work indoors at 5:00 a.m. or 6:00 a.m. whose schedules remained the same.  Third, although Plaintiff argues that Mr. Hopkins changed her hours, she offers no evidence to dispute Defendant's evidence that the decision was made by Mr. Fernandez.  Finally, as discussed in more detail below, the two-hour change in Plaintiff's schedule was not an adverse employment action.  Plaintiff has not shown direct evidence of discrimination.

b.   **Inference of Discriminatory Intent**

Because Plaintiff does not put forth direct evidence of discrimination, her discrimination claims must be examined using the burden-shifting framework established in *McDonnell Douglas*. The familiar *McDonnell Douglas* framework "'compensat[es] for the fact that direct evidence of intentional discrimination is hard

---

her to lift furniture.  These arguments are not only contradictory but also unsupported by the record.

Plaintiff also argues that Mr. Hopkins testified that he did not want women working in the morning because they could not handle the pace of the tasks.  Plaintiff's characterization of Mr. Hopkins's testimony, here and elsewhere, is misleading.  Mr. Hopkins repeatedly testified that the only reason the women "could not" complete the early morning tasks was because there were no early morning tasks for them to do.  *See, e.g.*, ECF No. 76-2, at 27 ("[Q] [W]hat couldn't they do there that made you want [to change] their schedule?  A They could do their jobs. Just having the three employees, we had too many people working in the morning shift hours.  We had pretty much the morning staff coming in at five and six o'clock in the morning.").

to come by'" and "give[s] plaintiffs who lack direct evidence a method for raising an inference of discrimination." *Diamond v. Colonial Life & Accident Ins.*, 416 F.3d 310, 318 (4th Cir. 2005) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring)).   Under *McDonnell Douglas*, once the plaintiff meets her initial burden of establishing a *prima facie* case for a Title VII violation, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Lockheed Martin*, 354 F.3d at 285.   If the employer meets this burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'"   *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).   According to the United States Court of Appeals for the Fourth Circuit, "[t]he final pretext inquiry 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination,' which at all times remains with the plaintiff." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) (alteration in original) (quoting *Burdine*, 450 U.S. at 256).

To establish a *prima facie* case on a theory of disparate treatment, a plaintiff must show four elements:   (1) that she is

a member of a protected class; (2) that her job performance was satisfactory; (3) that she suffered an adverse employment action; and (4) that she was treated differently from similarly situated employees outside the protected class. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Court of Appeals of Md.*, 132 S.Ct. 1327 (2012). In its motion for summary judgment, Defendant challenges Plaintiff's showing on the second, third, and fourth elements. Here, without deciding whether Plaintiff has met her burden with regard to the second and fourth elements, the court finds that Plaintiff has not presented evidence showing an adverse employment action against her. Therefore, she cannot establish a *prima facie* case of discrimination.

"An adverse employment action is a discriminatory act which adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (citation and internal quotation marks omitted). In most cases, this type of action "inflicts direct economic harm," by way of "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761-62 (1998). Indirect actions that affect present and future

employment such as loss of job title, loss of supervisory responsibility, limited access to training programs, or reduced opportunities for promotion also qualify as adverse employment actions. *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999); *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981).

The adverse employment actions Plaintiff identifies were: (1) the two-hour change to her schedule in May 2010, which she argues deprived her of an accommodation to provide care for her daughter; (2) her March 2011 performance evaluation and subsequent placement in PIP; and (3) constructive discharge. (ECF No. 74, at 36-37, 40-45). Plaintiff also argues that she suffered hostile working conditions during the summer of 2010, none of which separately constitute an adverse employment action, *see, e.g.*, *Allen v. Rumsfeld*, 273 F.Supp.2d 695, 702 (D.Md. 2003), but which will be addressed in the context of her constructive discharge argument.[10]

### 1) Schedule

The two-hour change in Plaintiff's schedule was not an adverse employment action. The schedule change did not affect her pay, responsibilities, title, opportunities for advancement, or even her shift, and therefore was not a direct or indirect

---

[10] Curiously, although Defendant reserved the argument in its motion to dismiss or for summary judgment, Defendant does not argue that Plaintiff's claims are time-barred. As the only allegedly discriminatory acts within the 300-day statutory limitations period were Plaintiff's intake to PIP and resignation, the question appears to be a good one.

adverse employment action. *Cf. McCain v. Waste Mgmt., Inc.*, 115 F.Supp.2d 568, 575 (D.Md. 2000) (holding that a plaintiff who retained his position but was transferred from the day shift to the night shift had not suffered an adverse employment action). Plaintiff argues that she lost an accommodation for childcare for her daughter as a result of the change, and that this constitutes an adverse employment action. In 2001, when Plaintiff's daughter was six years old, her hours were changed from 10:30 a.m. to 7:00 p.m., to 6:30 a.m. to 3:00 p.m. Plaintiff testified that this was to make to easier for her to pick up her daughter after school. (ECF No. 76-1, at 4). Assuming *arguendo* that the 2001 schedule change was an accommodation, and that the loss of such an accommodation could be an adverse employment action, Plaintiff still has not shown that the 2010 change to her hours adversely affected the terms, conditions, or benefits of her employment. By 2010, Plaintiff's daughter was fifteen years old. (*Id.* at 25). Plaintiff has put forward no evidence that she continued to require an accommodation to provide childcare, or that the change in her hours affected her childcare arrangements or ability to provide childcare in any way. Plaintiff's testimony suggests that she was primarily unhappy with the schedule change because it increased her transportation costs (*see id.* at 24-25), but this is not an adverse employment action.

28

**2) Performance Review and PIP**

Plaintiff acknowledges that a negative performance review and placement on PIP do not constitute an adverse employment action where it does not expose the individual to economic harm. (ECF No. 74, at 41 & n.37). She argues that her placement on PIP was an adverse employment action because it prevented her from applying to other positions and diminished her opportunities for promotion. Defendant's policy was that an employee is "not eligible to voluntarily transfer to or apply for another position" while they are participating in a PIP option. (ECF No. 70-13 ¶ 9). Defendant's policy prohibiting an employee from transferring to a new position before she has successfully completed the PIP had no effect on the terms and conditions of her employment, but instead gave her time and resources to improve her performance while remaining in her current position. *See Bonnette v. Shinseki*, 907 F.Supp.2d 54, 71 (D.D.C. 2012); (*see also* ECF No. 70-13 ¶¶ 9-10). Furthermore, there is no evidence that Plaintiff's negative performance review or PIP would have affected her opportunities for promotion. Plaintiff has not shown that her performance review or PIP materially affected her work status or caused any economic harm, and accordingly, has not shown that she suffered an adverse employment action.

### 3)   Constructive Discharge

Although  Plaintiff  refers  in  her  opposition  to  her
"termination"  and  "firing"  (ECF  No.  74,  at  39),  she  concedes
that  she  resigned  without  notice  and  asserts  a  claim  of
constructive  discharge  (*id.* at  43-45).   "Because  the  claim  of
constructive  discharge  is  so  open  to  abuse  by  those  who  leave
employment  of  their  own  accord,  this  Circuit  has  insisted  that
it  be  carefully  cabined."  *Honor v. Booz-Allen & Hamilton, Inc.*,
383  F.3d  180,  187  (4th  Cir.  2004)  (quoting  *Paroline v. Unisys
Corp.*,  879  F.2d  100,  114  (4th  Cir.  1989)).   A  constructive
discharge  is  a  form  of  an  adverse  employment  action,  and  occurs
when  "an  employer  deliberately  makes  an  employee's  working
conditions  intolerable  and  thereby  forces  him  to  quit  his  job."
*Bristow v. Daily Press, Inc.*,  770  F.2d  1251,  1255  (4th  Cir.  1985)
(quoting  *Holsey v. Armour & Co.*,  743  F.2d  199,  209  (4th  Cir.
1984));  *see also James*,  368  F.3d  at  378;  *McCain*,  115  F.Supp.2d
at  574  ("To  advance  a  claim  for  'constructive  discharge,'  the
plaintiff  must  establish:  (1)  the  employer  deliberately  made  an
effort  to  force  the  employee  to  quit;  and  (2)  that  the  working
conditions  were  intolerable").   In  the  Fourth  Circuit,
"[d]eliberateness . . .  require[s]  proof  of  the  employer's
specific  intent  to  force  an  employee  to  leave,"  and  the
tolerability  of  working  conditions  "is  assessed  by  the  objective
standard  of  whether  a  'reasonable  person'  in  the  employee's

position would have felt compelled to resign.  'An employee may not be unreasonably sensitive to his working environment.' Thus, the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge." *Bristow*, 770 F.2d at 1251 (citations omitted) (quoting *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir. 1981)).

Plaintiff cannot prove either element of constructive discharge.  She relies on isolated incidents a year prior to her resignation for her claim, including being assigned to move furniture and work outside.  (ECF No. 74, at 44-45).  Tasks such as moving furniture, collecting branches, and performing other work outdoors were within her job description and part of the normal duties of a BSW.  A reasonable person would not have felt forced to resign over being tasked with responsibilities that were within her job description and performed by all workers. Plaintiff also references "monitoring tactics" as part of the intolerable working conditions and alleges that she was watched through the school's security cameras, but her only evidence of being "monitored" was related to ensuring she was working her scheduled hours in the spring of 2010.  *Cf. Allen*, 273 F.Supp.2d at 702 (finding that scrutiny and documentation of employee's tardiness and absenteeism did not adversely affect terms, conditions, or benefits of employment).  Similarly, the other incidents Plaintiff describes, such as her access to supplies

31

being controlled, the documentation of her alleged misuse of supplies, and allegedly working without air conditioning once, all of which occurred between six and fourteen months before her resignation, would not compel a reasonable person to resign.

Plaintiff also argues that she was "assaulted by Hopkins on school premises" (ECF No. 74, at 43, 45), referring to her testimony that Mr. Hopkins "pushed [a] trash can into the direction where my arm was when I was cleaning the window" one time in June or July 2010 (ECF No. 76-1, at 52-53).[11]   The evidence does not support that Plaintiff was assaulted by her supervisor; at most, it shows that she sustained a minor injury on the job, a year before she resigned, for which she did not seek treatment or worker's compensation.   Taking the evidence in the light most favorable to Plaintiff, she has not shown that any of these alleged one-time incidents were objectively so intolerable as to compel a reasonable person to resign, particularly given the year-long temporal gap between their

---

[11] Mr. Hopkins denies this incident occurred. (ECF No. 70-7, at 37).   Plaintiff also testified that she immediately reported the incident to then-Assistant Principal Mildred Charley-Greene, who saw a mark left by the trash can and reprimanded Mr. Hopkins. (ECF No. 76-1, at 52-53).   In her affidavit, Ms. Charley-Greene states, "I never witnessed any type of assault by Tony Hopkins against Maria Melendez; I never observed any type of injury on Maria Melendez; and Maria Melendez never reported any type of injury or assault inflicted upon her by Tony Hopkins." (ECF No. 70-27 ¶ 3).   She described her protocol for such allegations and for injuries, and stated that Plaintiff's allegations regarding this incident "are absolutely false." (*Id.*).

occurrence and her resignation.[12]   "[M]ere '[d]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.'" *James*, 368 F.3d at 378 (alteration in original) (quoting *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1985)).

Moreover, Plaintiff has shown no evidence of her employer's intent to force her to resign.  In fact, the undisputed evidence is that Plaintiff's employers were surprised by her resignation and urged her to reconsider her decision.  (ECF No. 70-22 ¶ 15). Confusingly, Plaintiff argues only that "an actual assault includes the element of intent."  (ECF No. 74, at 45).   Only Plaintiff's briefing uses the term "assault," and she testified only that Mr. Hopkins pushed a trash can in her direction. Plaintiff testified that she did not report the incident to the police (*see* ECF No. 76-1, at 53), Mr. Hopkins was not convicted of assault, and there is no evidence that Mr. Hopkins acted with the requisite intent of assault.  Regardless, even a showing that Mr. Hopkins assaulted Plaintiff would not show that he did

---

[12] Plaintiff's unfounded accusation that Mr. Hopkins attempted to poison her by tampering with her water bottle in 2011 similarly falls far short of meeting her burden here. Although Plaintiff testified that she believed someone had poisoned her water (*see* ECF No. 76-1, at 49-51), she has put forth no evidence that anyone tampered with her water, much less that Mr. Hopkins did so and did so in order to force her to resign.

so in order to force her to resign.  Plaintiff has not shown that anyone imposed intolerable working conditions with the intent to compel her to resign.

"The employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred.  They cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting." *Bristow*, 770 F.2d at 1255.  Because Plaintiff has not presented evidence that she suffered an adverse employment action, she cannot establish a *prima facie* case of discrimination, and Defendant's motion for summary judgment will accordingly be granted as to Count I.

### 2.   Count II, Retaliation

To establish a *prima facie* case for retaliation, Plaintiff must show that:  (1) she engaged in protected activity; (2) her employer took a materially adverse action against her; and (3) a causal connection existed between the protected activity and the adverse action.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61-67 (2006); *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006).  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Burlington N.*, 548 U.S. at 68 (internal

quotation marks omitted) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). The standard focuses on materiality because "it is important to separate significant from trivial harms," and is an objective standard for purposes of judicial administrability. *Id.* at 68-69. If Plaintiff establishes her *prima facie* case of retaliation, the burden shifts to Defendant to offer evidence of a legitimate, non-retaliatory reason for the adverse action, after which the burden shifts back to Plaintiff to produce evidence that Defendant's proffered reason was a pretext for retaliation. *Anderson v. G.D.C., Inc.* 281 F.3d 452, 458 (4th Cir. 2002).

Protected activity includes opposing an "unlawful employment practice" under Title VII or "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in . . . [a Title VII] investigation, proceeding, or hearing[.]" 42 U.S.C. § 2000e-3(a). Plaintiff argues that her May 26, 2010, letter to the office of human resources was a protected activity. Plaintiff also identifies her calls to her union in October 2010 and January 2011 as protected activities, but there is no evidence that any other employee at AEHS or of Defendant was made aware of these later complaints.[13] Without evidence that her employer knew of the protected activities, Plaintiff cannot

---

[13] In fact, it is undisputed that Plaintiff instructed the union not to investigate her renewed complaint or contact the school in October.

establish a causal connection between the activities and subsequent adverse action. *See, e.g.*, *Balas v. Huntington Ingalls Indus.*, 711 F.3d 401, 410-11 (4th Cir. 2013); *Smith v. Vilsack*, 832 F.Supp.2d 573, 586 (D.Md. 2011). Plaintiff has shown evidence only that she may have engaged in a protected activity through her May 26 complaint.

The adverse actions Plaintiff alleges are the same as those that form the basis of her discrimination claim, including assigning Plaintiff to tasks such as moving heavy furniture and tree branches, monitoring her while she was working, and pushing a trash can towards her.[14] Although "a reassignment of duties can constitute retaliatory discrimination where both the former and present duties fall within the same job description," *Burlington N.*, 548 U.S. at 55, Plaintiff has not shown evidence that she was given new tasks in retaliation. Plaintiff argues that she was "subjected . . . to tasks ordinarily tasked to the male building service workers such as lifting heavy furniture, large tree branches, and the lifting of metal cabinets," which Mr. Hopkins "knew that Plaintiff would struggle to perform," in retaliation for her May complaint. (ECF No. 74, at 49, 57). Plaintiff declares that, "in May 2010, Tony would make us three

---

[14] As the change in Plaintiff's schedule was made prior to her letter of complaint, it cannot be the basis of her retaliation claim. Plaintiff has provided no evidence to support her argument that she engaged in a protected activity prior to her schedule change.

women, work outside to pick up the [] large tree branches in the
heat," and that "in July 2010, during the summer school session,
Tony would make us three women pick up heavy furniture, while
the male workers would sweep floors and laugh at us." (ECF No.
75-31 ¶ 6).   However, Plaintiff testified that her job duties
"include[] picking up heavy things," and in response to a
question of whether a BSW had to be able to life fifty pounds,
she answered, "Of course and we were doing that.  All along we
were doing that.  That's nothing new." (ECF No. 76-1, at 19).
She also testified that she had regularly been asked to clean up
outside in previous summers. (*Id.* at 16).  The other two female
morning shift BSWs also dispute Plaintiff's assertion that these
tasks were new and imposed in retaliation for their May
complaint.   Ms. Ayala testified that she sometimes worked
outside, including picking up branches; that she regularly had
to move heavy furniture; and that she worked with both men and
women to accomplish those tasks when Mr. Moreland was their
supervisor, prior to the May 2010 complaint. (*See* ECF No. 70-
15, at 6-13).  Ms. Miller stated in her affidavit:

> I was never asked to do any job tasks or
> work outside of my job description. . . .
> The male and female Building Service Workers
> were not treated any differently from each
> other.  The men and women Building Service
> Workers were all assigned the same job
> description and job duties.  Maria Melendez
> was always complaining that jobs she was
> asked to do were not part of her job
> description, but that was not true.  For

> example, Maria Melendez would refuse to
> clean the trash room or fix a plugged toilet
> because she felt that was a man's job duty.

(ECF No. 70-16 ¶ 8). To the extent that the events Plaintiff relies upon are supported by the record, and construing that evidence in the light most favorable to Plaintiff, she has not shown that her employer took materially adverse actions against her.[15]

Plaintiff has also failed to show that any such adverse action was causally connected to her letter of complaint in May 2010. A causal connection may "exist[] where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Price v. Thompson*, 380

---

[15] Moreover, assuming *arguendo* that Plaintiff's assigned tasks did change in the summer of 2010, Mr. Seaforth stated in his affidavit:

> I was aware that there was a culture that
> had developed at AEHS before I began working
> there that allowed women to exclude
> themselves from some types of building
> service work. However, upon my transfer to
> AEHS, I made it very clear that there would
> be no gender differentiation for building
> service work. The language in the BSW job
> description is the expectation for all BSWs
> regardless of gender. During the summer of
> 2010, Ms. Melendez told me that she did not
> believe that women should have to move
> furniture, and that this was men's work.
> However, I explained that these duties fall
> within her job description, and reiterated
> that there is no differentiation by gender
> for the building service work.

(ECF No. 70-22 ¶ 5). Plaintiff has not shown that this legitimate, non-retaliatory reason for her assignment to new duties within her job description is pretextual.

F.3d 209, 213 (4th Cir. 2004).    Mr. Hopkins and other
decisionmakers at AEHS were clearly aware of Plaintiff's May 26
complaint, but knowledge of prior protected activity alone is
insufficient to establish causation.   *Gibson v. Old Town Trolley
Tours of Washington, D.C., Inc.*, 160 F.3d 177, 182 (4th Cir.
1998).    There must be evidence that Defendant was motivated in
some way by Plaintiff's protected activity to take adverse
action.   *See id.*   Here, Plaintiff presents no such evidence, and
she cannot create a genuine issue of material fact through mere
speculation or the building of inference upon inference.

Plaintiff also argues that Mr. Hopkins retaliated against
her in February and March 2011 by giving her performance
counseling and a negative performance review that led to her
automatic placement on PIP.   Several courts have observed that a
poor performance review may not be a materially adverse action.
*See Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F.Supp.2d 480, 492
(D.Md. 2013) ("[N]one of the following constitutes an adverse
employment action in a retaliation claim: failing to issue a
performance appraisal; moving an employee to an inferior office
or eliminating the employee's work station; considering the
employee 'AWOL'; or issuing a personal improvement plan, 'an
"Attendance Warning,"' a verbal reprimand, 'a formal letter of
reprimand,' or 'a proposed termination.'" (quoting *Rock v.
McHugh*, 819 F.Supp.2d 456, 470-71 (D.Md. 2011))); *Simmington v.*

*Gates*, No. DKC-08-3169, 2010 WL 1346462, at *13 (D.Md. Mar. 30, 2010) (collecting cases).   Here, even assuming Plaintiff's evaluation was a materially adverse action, it was conducted more than nine months after Plaintiff's letter of complaint.[16] *See King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (noting that two-and-a-half month length of time between notice of complaint and adverse action "is sufficiently long so as to weaken significantly the inference of causation between the two events").   Plaintiff's causation arguments are entirely speculative, and are premised on the contention that Mr. Hopkins was responsible for Plaintiff's evaluation despite undisputed evidence that Mr. Seaforth conducted the evaluation.   Moreover, Defendant has offered legitimate, nondiscriminatory reasons for Plaintiff's evaluation.   Mr. Seaforth set forth in his affidavit Plaintiff's "excessive absentee record," specifically that she had not worked a full pay period between July 1, 2010, and her evaluation on March 2, 2011; his own observations of Plaintiff's interactions with other employees and students; and the feedback and complaints from other employees that were the basis for Plaintiff's performance evaluation.   (ECF No. 70-22 ¶¶ 8-10).

---

[16] Plaintiff relies here on her October 2010 and January 2011 union complaints to argue for a shorter length of time (ECF No. 74, at 54-55), but again, she has not shown that these complaints were known to her employer at the time of the alleged retaliation.

Plaintiff has shown no evidence that the concerns noted in her review were false and pretextual.

The evidence does not support a finding of retaliation, and Defendant is entitled to summary judgment on Count II.

### 3.    Count IV, Hostile Work Environment

Plaintiff also alleges a Title VII claim for hostile work environment.  To establish a *prima facie* case of hostile work environment harassment, Plaintiff must show:  (1) that she was subjected to unwelcome conduct; (2) the unwelcome conduct was based on a protected ground; (3) it was sufficiently pervasive or severe to alter the conditions of her employment and to create a hostile work environment; and (4) some basis exists for imputing liability to the employer.  *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 241-42 (4th Cir. 2000).  Plaintiff's claim relies on the same incidents discussed above that Plaintiff attributes to Mr. Hopkins.[17]  Defendant argues that Plaintiff cannot establish that the harassment she claims she suffered was because of her gender or that the alleged conduct

---

[17] Specifically, Plaintiff argues that the requirement that she move furniture and tree branches was "manual labor," required so that her supervisor and male colleagues could "laugh at [her] inability"; that her supervisor "physically assaulted [her] by throwing a trash can in her direction and bruising her arm"; and that she was "yelled at" in front of teachers, monitored through the school's security cameras, forced to work without air-conditioning, and "suppressed [in her] ability to do her job." (ECF No. 74, at 57). Plaintiff also argues that her "belie[f] that Hopkins tried to poison her when she discovered that her water bottle was tampered" is evidence of severe and pervasive abuse. (*Id.*).

was sufficiently pervasive or severe to create a hostile work environment.

Plaintiff must do more than claim membership in a protected class to establish that harassment was based on her gender; she must "show that she was 'singled out for adverse treatment by the harasser because of her membership in a group protected by Title VII.'" *Khoury v. Meserve*, 268 F.Supp.2d 600, 612 (D.Md. 2003) (quoting *Doe v. Petaluma City Sch. Dist.*, 949 F.Supp. 1415, 1423 (N.D.Cal. 1996)). Plaintiff's own opinion or speculation as to gender animus cannot suffice to prove that she suffered unwelcome conduct due to sex. *See, e.g., Nicole v. Grafton Sch., Inc.*, 181 F.Supp.2d 475, 482–83 (D.Md. 2002). The only evidence Plaintiff proffers to support the proposition that she was harassed because of her gender is Mr. Hopkins's alleged statement that he did not want women to work in the morning, and her unsupported contention that this was because he "believed that wom[e]n were unable to perform at the rate of men in the morning and therefore would [have] impeded the tasks of the morning shift[.]" (ECF No. 74, at 56). As discussed above, while it is disputed whether Mr. Hopkins made this statement, this issue alone is not enough for Plaintiff's claims to survive summary judgment because the statement does not evince discriminatory intent. None of the events Plaintiff describes as creating a hostile work environment explicitly referred to

her gender, and there is simply no evidence in the record connecting the allegedly hostile actions of Mr. Hopkins with sex-based discriminatory motives.

Furthermore, Plaintiff fails to establish that the harassment she claims she suffered was sufficiently pervasive or severe to create a hostile work environment.  The determination of the sufficiency of an environment's hostility or abusiveness should be made by considering the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *accord Smith*, 202 F.3d at 241-42.  Plaintiff argues that she was forced to do "manual labor," but it is undisputed that the tasks she describes were her job responsibilities and required of all the BSWs.  Her argument is premised on her apparent belief that male and female employees in the same position should have been treated differently; the fact that employees were *not* treated differently based on their gender clearly cannot prove gender-based harassment.  The incident in which Mr. Hopkins allegedly pushed a trash can towards Plaintiff and bruised her arm is the most severe of those that Plaintiff describes, but it allegedly occurred only once and therefore does not establish sufficiently

43

frequent hostile treatment. The evidence, drawing the inferences therefrom in the light most favorable to Plaintiff, does not establish treatment that is objectively physically threatening or humiliating, or otherwise sufficiently severe to alter the conditions of her employment and create a hostile work environment prohibited under Title VII. Defendant's motion for summary judgment on Plaintiff's hostile work environment claim will therefore be granted.

### 4. Count III, Disparate Treatment, and Count V, Adverse Employment Action

Count III of Plaintiff's second amended complaint is a claim for "disparate treatment" under Title VII. (ECF No. 30, at 24). Defendant argues that disparate treatment is duplicative of Count I, Plaintiff's claim for sex discrimination. (ECF No. 70-2, at 43). Additionally, as the court previously noted, Plaintiff labels Count V of the second amended complaint as "adverse employment action under Title VII," but an "adverse employment action" is not a separate cause of action under the statute. (ECF Nos. 30, at 26; 45, at 6 n.3). Plaintiff stated in her opposition that her disparate treatment claim was incorporated into her sex discrimination claim argument, but did not otherwise respond to Defendant's arguments as to Counts III or V. (ECF No. 74, at 35 n.35). Accordingly, judgment will be entered for Defendant on Counts III and V.

44

**IV.   Conclusion**

For the foregoing reasons, the motion for summary judgment filed by Defendant will be granted.   Plaintiff's motion to strike will be denied.   A separate order will follow.


                                  /s/
                        _____
                        DEBORAH K. CHASANOW
                        United States District Judge